**UNITED STATES DISTRICT COURT**

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| GINA MYERS, | Case No. 1:12-CV-00378-LJO-GSA |
| Plaintiff, | FINDINGS AND RECOMMENDATIONS RECOMMENDING THAT THE COURT AFFIRM DENIAL OF BENEFITS AND ORDER JUDGMENT FOR COMMISSIONER |
| v. | |
| CAROLYN W. COLVIN, Acting Commissioner of Social Security, | |
| Defendant. | |

Plaintiff Gina Myers ("Plaintiff"), by her attorney Sengthiene Bosavanh, seeks review of the final decision of the Commissioner of Social Security ("Commissioner" or "Defendant") denying her application for disability insurance benefits (DIB) under Title II and supplemental security income (SSI) under Title XVI of the Social Security Act. The matter is before the Court on the parties' briefs, which were submitted, without oral argument, to Magistrate Judge Gary S. Austin. The undersigned recommends that the Court affirm the Commissioner's denial of benefits.

**I.      Facts and Prior Proceedings**[1]

Plaintiff applied for benefits in October 2005, alleging disability as of October 2, 2004. Her applications were denied in August 2006 and upon reconsideration in January 2007. After a hearing in February 2008, ALJ William C. Thompson denied her application on July 10, 2008.

---

[1] References to the Administrative Record will be designated as "AR," followed by the appropriate page number. Where the applicable DIB and SSI regulations are virtually identical, only the DIB regulation will be identified.

The Appeals Council granted review and remanded for further proceedings in March 2009. It found that the ALJ had failed to address a statement by the witness's mother and that the medical opinions regarding Plaintiff's mental impairments did not seem fully consistent with subsequent records. After obtaining updated records and medical examinations, the ALJ held a second hearing on May 5, 2010. He again denied Plaintiff's applications on July 16, 2010. Plaintiff requested review on August 4, 2010. The Appeals Council denied review on January 10, 2012.

### A.    **Medical Record**

Plaintiff was born in October 1971. She had a high school education and vocational training as a medical receptionist. She last worked in 2003 as a customer service representative. AR 51-53. She lost that job when the company went out of business; she spent the next two years taking care of her grandmother full-time, until her grandmother was moved to a nursing home in roughly July 2005. AR 323-37. She claimed disability due to a variety of mental impairments (bipolar disorder, PTSD, depression, and anxiety disorder) and physical impairments (including hypothyroidism, obesity, and right patellar dislocation). She claimed disability as of October 2, 2004.

The earliest medical record available is from August 3, 2004. AR 299-300. Plaintiff was referred to Linda LaTorre, a certified physician's assistant with Sonora Indian Health, to monitor her hypothyroidism. Ms. LaTorre provides the bulk of treatment in this claim, supervised by Dr. Robert Reina, M.D. This was apparently her first examination of Plaintiff. She reviewed labs, noted that thyroid levels were normal, and instructed Plaintiff to stay on her current dose of thyroid medicine. At the appointment, Plaintiff's chief complaint was heartburn and nausea over the past six months, exacerbated by stress. Ms. LaTorre gave Plaintiff samples of Aciphex. According to the treatment record, Plaintiff stated she got angry and was short-tempered.

The next month (September 2004), Plaintiff saw Dr. Reina. AR 298. She denied nausea and vomiting. Her only complaint was a dry cough. She was given Robitussin and more Aciphex.

On roughly October 5, 2004, Plaintiff hurt her knee while moving furniture. (As Plaintiff later explained to a consultative examiner, she first injured her knee when she was 14 years old. Over the years she continued to reinjure it. Later she gained weight and the pain became worse. AR 440.) She self-treated with ibuprofen for four or five days, then went to the emergency room on

2

October 10, 2004, complaining of back pain radiating into her right leg. AR 312-13, 325. She was given Vicodin and Valium, but she did not take these because they made her sick.[2]

Two months later (December 2004), Plaintiff returned to Ms. LaTorre. The County had denied coverage of Aciphex; she again reported heartburn, but denied nausea or vomiting. AR 325. Her back pain had gotten better since her emergency room visit. However, she still had pain in her right knee. Ms. LaTorre recorded Plaintiff's subjective complaints, requested x-rays (which were obtained—*see* AR 316), and gave her an ACE wrap and ibuprofen.

Two months later, in February 2005, the knee had gotten worse. Plaintiff obtained a referral to see Dr. Frank Whitney, M.D., an orthopedic surgeon at Tuolumne General Hospital. The record of that visit is missing, but in March 2005, Plaintiff described the visit to Ms. LaTorre: Dr. Whitney had reviewed her x-rays and, while he would first require an MRI, he did feel that Plaintiff needed surgery. AR 323. Also in March, Plaintiff reported that Zantac kept her reflux under control. She had no complaints relating to hypothyroidism. She asked Ms. LaTorre to put her on state disability.

Four months later, in July 2005, Plaintiff reported that she had been caring for her grandmother full-time since she fractured her hip; her grandmother had only recently been moved to a nursing home. AR 322. Consequently, Plaintiff had neglected to obtain refills of her thyroid medication. Also in July 2005, Plaintiff saw Dr. Whitney. AR 314. Based on his review of a knee MRI from April (*see* AR 315) and his physical examination, he recommended surgery.

In August 2005, Plaintiff saw Ms. LaTorre for a closed head injury. AR 321. Her husband, who had been physically and verbally abusive throughout their marriage, AR 426, had struck her with a flashlight. AR 321. A police report was made and he was arrested; they separated after this incident. *Id.* In terms of physical trauma, Plaintiff did not lose consciousness, and CT scan was "negative" (according to the consultative examiner). AR 337. Although Plaintiff claimed head injury as a cause of disability in a disability report four months later, there is no discussion of any residual effect from this injury either in medical records or in medical opinions. On the other hand, her

---

[2] Vicodin has caused Plaintiff nausea, but she has taken it when needed. She reports no difficulties with Valium. *See* AR 230, 321, 359 (in August 2005, November-December 2005, and March 2006, instances in which Plaintiff was given Vicodin for pain); AR 465 (in April 2010, Plaintiff reported that "she has found in the past that Valium has helped greatly" to relieve her anxiety; she was using some from a friend until she was arrested for having a controlled substance not prescribed to her).

husband's abuse would remain a source of psychological trauma. Four years later, the consultative examiner diagnosed PTSD on this basis. AR 426-29.

As a result of this assault, Plaintiff became eligible through a "Victim/Witness" program to have weekly therapy with Dr. Arlene Giordano. However, after her first session in October 2005, she stopped taking advantage of this opportunity. On December 14, 2005, nearly nine weeks after her first session, she had not seen Dr. Giordano again. AR 225. After four more weeks (January 9, 2006), Ms. LaTorre observed that Plaintiff "has not been seeing [Dr. Giordano] lately" and "encouraged her to go back to see Dr. Giordano." AR 319. Two weeks later, Plaintiff was seeing Dr. Giordano "weekly," indicating that no more than three sessions had occurred. AR 399. On May 2, 2006, after reporting angry outbursts and self-abusive behaviors, Plaintiff "promise[d] to reschedule with Dr. Giordano and to go to Kings View should her moods go out of control again." AR 398. However, two weeks later (May 16, 2006), Ms. LaTorre noted that Plaintiff's eligibility to see Dr. Giordano had ended. AR 321. On that date, she referred Plaintiff for therapy to Dr. Rourke at Sonora Mental Health, but Plaintiff did not try to see Dr. Rourke until four months later. AR 395, 411.

At the initial appointment on October 13, 2005, Dr. Giordano diagnosed Plaintiff with a mood disorder and recommended a mood stabilizer. AR 225, 297. Two weeks later (October 26, 2005), Plaintiff applied for disability benefits. Later that week (October 31, 2005), Plaintiff told Ms. LaTorre she had episodes of "flipping out for no good reason." AR 297. Ms. LaTorre started Depakote 250mg, with the plan to raise to 500mg in six weeks. Plaintiff also reported knee pain.

Five weeks later (December 7, 2005), Dr. Whitney performed a proximal and distal extensor realignment surgery to treat chronic instability of the right patella. The surgery was uneventful. AR 329-33. At the postop one week later (December 14, 2005), Dr. Whitney instructed Plaintiff that for the next four weeks, she should wear a long leg brace when walking and allow only partial weight-bearing on her leg; at the end of the month, she would still need to wear the leg brace but should return to full weight-bearing, and he would start a program to progressively improve her range of motion, including physical therapy. AR 335.

Within one to three weeks after this surgery, Plaintiff and her mother submitted three separate forms to the state agency describing Plaintiff's symptoms and functional limitations. The

first form was a Disability Report which Plaintiff submitted on the same day as the postop. (December 14, 2005). AR 221-29. She alleged inability to work due to "right knee, depression, head injury, thyroid." She stated she could not sit more than about 10 minutes or stand more than 3-5 minutes. Her medications included Celebrex for swelling problems and Hydrocodone for knee pain. She also reported Levothyroxine for thyroid therapy and Depakote for depression.

Two weeks later (December 25, 2005—three weeks after her surgery), Plaintiff completed a Pain Questionnaire. AR 230-32. She acknowledged that she had had knee surgery three weeks earlier. She described the pain as 7 out of 10. It extended from her knee into her foot, aggravated by any twisting and only slightly resolved with medication. After knee surgery she was required to use a walker for ambulation. Due to the pain, she could no longer "drive, bathe w/out help, cook, clean, [or] stand for very long." She wrote, "I can't do any chores without the pain being unbearable." The questionnaire asks: "When did the pain first begin to affect your activities?" Plaintiff wrote: "Some in Oct. of 2004. But mostly since Dec. 7th 2005 when I had surgery."

On the same day (December 25, 2005), Plaintiff's mother also provided a Third Party Function Report. AR 233-40.  The report indicated that Plaintiff used a walker to go to the restroom, could not drive because "right now she has a brace on her leg," would wake during the night in pain, and had trouble enjoying TV or reading because of "pain medications messing with concentration." (Plaintiff had been prescribed Vicodin for the surgery.)  With regard to Plaintiff's psychological limitations and cognitive abilities, Plaintiff's mother indicated that Plaintiff interacted with people in person, on the phone, and on the computer. She could pay bills, handle a savings account, use checkbooks or money orders, and count change.  However, Plaintiff had "extreme mood swings." AR 238.   She was not able to handle stress because she becomes out of control and suicidal. Moreover, "She sometimes thinks people are trying to kill her." AR 239.

Two weeks later (January 9, 2006), Plaintiff reported a decrease in explosive outbursts on Depakote, but now had periodic crying outbursts and described an instance of suicide ideation during the holidays (referring apparently to Christmas, when she completed the forms with her mother). AR 319. She acknowledged that being confined in a knee brace was adding to her depression. Ms. LaTorre recorded a diagnosis of bipolar with intermittent explosive disorder. Two

weeks later (January 25, 2006), Plaintiff was doing better and had no more suicide ideation, but still had episodes of uncontrollable crying. AR 399. She believed her improvement was due in part to the fact that she now had less external stress. Ms. LaTorre now recorded diagnoses of cyclic depression and intermittent explosive disorder. Plaintiff was started on Lamictal as an anti-depressant.

Two days later (January 27, 2006—seven weeks after surgery), Plaintiff returned for a scheduled post-op. AR 370. She reported she was "not doing very well"—she described weakness, edema, and pain. She had been "rather inactive." The knee showed tenderness. She was prescribed physical therapy, which she attended from February through June 2006. AR 350-57, 365-68.

In March 2006, Plaintiff's grandmother died of cancer. Although this was not mentioned in the records at the time, Plaintiff would continue to identify this as a major source of stress months and years later. AR 395 (August 2006), AR 411 (September 2006), AR 409 (in December 2007, reporting grief at grandmother's birthday in October and over holidays); AR 465 (at April 2010 emergency room visit, identifying fourth anniversary of death as possibly contributing to increased stress level). When Plaintiff was born, her mother was fifteen years old, and she was raised by her grandmother. AR 411. Since 2003, when Plaintiff's employer went out of business and Plaintiff lost her job, Plaintiff cared for her grandmother full-time until her grandmother fractured a hip and was moved to a nursing home in July 2005. AR 337. Plaintiff was also no longer with her husband since the assault in August 2005. Plaintiff would later explain that she had never lived by herself and characterized this as major cause of her dysfunction. AR 411.

In early March 2006, after her seventh physical therapy visit, the physical therapist reported that Plaintiff was "gradually improving in therapy." On March 16, 2006, Plaintiff underwent knee manipulation under anesthesia to increase her range of motion. AR 358-62.

Approximately two months after her grandmother's death (May 2, 2006), Plaintiff reported to Ms. LaTorre that her physical therapy and knee recovery had not been going well; "her chief reason for being here however, is her depression." AR 398. She reported anger outbursts, anxiety attacks, and some self-abusive behavior, involving hitting herself on her arms leading to mild bruising. However, Plaintiff had not been going to see her counselor, Dr. Giordano. (Later that month her

entitlement to therapy under the "Victim/Witness" program would come to an end. AR 397.) Ms. LaTorre concluded that Lamictal was not effective and recommended Topamax.

The next day (May 3, 2006), consultative examiner S.K. Madireddi, M.D., examined Plaintiff for physical impairments. AR 337-39. Dr. Madireddi noted "very slight effusion of the right knee as would be expected." Extension was normal, flexion was limited to 130 degrees. After examination, Dr. Madireddi opined that Plaintiff should be able to lift 20 pounds frequently and 25 pounds infrequently, but should not squat. Plaintiff said she wore her knee brace "on occasion," and Dr. Madireddi expected she would continue to do so for six to nine months.

The next day (May 4, 2006), at the physical therapy session 19 of 24, Plaintiff said her leg was sore from dancing and miniature golfing with her kids. She added that a "friend fell on my knee." The physical therapist attributed Plaintiff's instability to "significant thigh weakness and need to increase proprioception and dynamic activity" (i.e., body awareness and exercise). AR 354-55.

On May 13, 2006, consultative psychiatrist Stefan Lampe, M.D., performed a mental health examination. AR 340-42. Plaintiff reported (falsely) that she did not use drugs. She also mentioned that she was in physical therapy. Dr. Lampe assigned a GAF of 45. However, Plaintiff could relate and interact with supervisors and co-workers; understand, remember, and carry out simple instructions; and deal with the public. Her ability to withstand the stress and pressure of an 8-hour workday on an ongoing basis depended on the type of work she did. Her prognosis was good. He felt that with appropriate treatment, her symptoms should stabilize within six months.

Three days later (May 16, 2006), Plaintiff asked Ms. LaTorre for a letter for her Section 8 housing stating that she needed a caregiver so she could have a friend stay with her through the night. AR 397. She hoped the friend would help control her rage behavior and self-abusive behavior. *Id*. Later records indicate that Plaintiff was referring to her cousin. As explained above, it appears that her desire to have her cousin move in was related to the death of her grandmother two months earlier as well as the domestic violence incident in August 2005, which led to her separation from her husband. Ms. LaTorre agreed to dictate a letter. AR 397. The letter stated that a live-in caregiver would not be medically necessary but would be medically helpful. AR 396. Because Plaintiff's Topamax had not yet been approved, Ms. LaTorre increased her Depakote. AR 397.

Five days later (May 21, 2006), Dr. Whitney reported that Plaintiff's surgery appeared to have healed well, but Plaintiff ambulated slowly and had a low pain threshold. AR 353. His assessment was that supervised exercise was still needed because Plaintiff demonstrated that she had low motivation. Five weeks later (June 28, 2006), the physical therapist's discharge report noted that Plaintiff had reported soreness climbing four flights of stairs and that she reported falling often. AR 350-51. According to the note, when the therapist last saw Plaintiff—roughly three weeks earlier, as Plaintiff had missed her final appointment—Plaintiff's pain level was less than 4 out of 10 on the pain scale and her leg strength was 4 out of 5. AR 350.

In July 2006, the state agency concluded that Plaintiff was not disabled and could do her past work. AR 111. Its assessment of her physical limitations was based on the June 2006 opinion of state agency reviewing physician W.G. Jackson relating to her knee condition for the period from October 2004 through December 2005 (the date of her surgery). AR 343-47. She could lift 10 pounds occasionally and less than 10 frequently; could stand/walk at least 2 hours and sit about 6 hours in an 8-hour day; and could not push or pull with her right knee or climb ladders, ropes, or scaffolds. By December 2006, her knee impairment would no longer be severe. AR 111. Its assessment of her mental limitations was based on the opinion of psychiatrist Richard Gross, M.D. On July 12, 2006, he assessed her RFC relating to her mental impairments (a depressive affective disorder) for the period from October 2004 through July 2006. AR 371-85. He concluded that Plaintiff did not meet or equal a listing.[3] In fact, her mental impairments were not even severe.

On August 31, 2006, three months after she last saw Ms. LaTorre, Plaintiff reported that her cousin was now living with her and was helping to encourage her to eat well, go for walks, wake up on time, etc… AR 395. However, she also reported a resurgence of grief from her grandmother's death five months earlier. Topamax had still not yet been approved, so Ms. LaTorre started her on samples. Ms. LaTorre also instructed Plaintiff to make an appointment for therapy. AR 262, 395.

---

[3] This opinion is probably not relevant to the question posed in this case of whether Plaintiff's physical and mental impairments together equal a listing. Under the regulations, "[p]sychological consultants are limited to the evaluation of mental impairments." 20 C.F.R. § 404.1615(d). Even "when there is a combination of a mental impairment with another impairment," a psychological consultant may opine only when "the mental impairment alone would justify a finding of disability." 20 C.F.R. § 404.1616 (f).

As part of the reconsideration process, Plaintiff completed a Disability Report Appeals on September 7, 2006. AR 260-68. The only suggestion of continued knee pain was the medicine list, which showed that Dr. Whitney had instructed Plaintiff to take hydrocodone for pain and naproxen for pain and swelling. Otherwise, Plaintiff focused on psychological issues. She stated that her condition had changed in March 2006. (The Court notes that this is when Plaintiff's grandmother died.) Her bipolar episodes had become more frequent and more extreme, and her doctor said she could not live alone. AR 261, *But see* AR 395-97 (not a doctor, but Ms. LaTorre, wrote that having a roommate "may benefit" Plaintiff's condition but was not medically necessary). She described extreme mood swings making social interaction difficult and yelling at people with no self-control. She was taking Depakote and Topamax for mood control. She continued to self-inflict wounds on her body, and stayed in bed for days at a time. Apparently due to her mental impairments, her roommate did all household chores; "I just can not." AR 266.

The next day—September 8, 2006, one week after Plaintiff's last visit with Ms. LaTorre—Plaintiff had her first counseling appointment with Dr. Rourke at Sonora Mental Health Clinic. AR 411; *see* AR 72, 262, 397, 416. Plaintiff complained of being overwhelmed and unable to function. She described her upbringing with her grandmother and explained that she usually relied on others to "take care" of her. Dr. Rourke noted that Plaintiff seemed "developmentally immature." AR 411.

Three months later (December 10, 2006), Plaintiff completed another function report. AR 269-76. This report is conspicuous for almost entirely failing to discuss physical impairments or limitations. At the end of the form, Plaintiff acknowledged that she was prescribed a knee brace eight months earlier, which she used when "walking any distance for extra support." Otherwise, the report described the impact of Plaintiff's depression. Among other things, Plaintiff reported that she disliked being around crowds or public places, yet did not want to be alone. She either slept all day or hardly at all, depending on her mood and level of depression. Contrary to earlier statements, she could prepare simple meals and go out of her house about three times a week. However, she was moody, unfriendly, and short with people; had difficulty with memory, completing tasks, maintaining concentration and understanding; and had difficulty following instructions.

In January 2007, the agency affirmed its prior decision on redetermination. AR 401-03.

Plaintiff returned to the clinic in February 2007. This represented a five-month lull in treatment - her last medical treatment had occurred with Dr. Rourke at the Sonora Mental Health Clinic in September 2006. AR 415. She said she had been out of her medications for an extended period of time, and felt that as a result, her depression, erratic behavior, and anger outbursts were increasing. Dr. Reina refilled her Depakote, Topamax, and Synthroid.

Plaintiff next returned to the clinic two months later (April 25, 2007). AR 414. Ms. LaTorre was no longer with the clinic, and Plaintiff saw a different physician's assistant, Marsha Teague. Plaintiff complained of knee pain. This was the first recorded subjective complaint of knee pain in nearly a year, since June 8, 2006. Then, at her second-to-last scheduled physical therapy session (the last session she actually attended), Plaintiff reported pain of "less than 4/10" and soreness after climbing four flights of stairs. AR 350-51. Now, in April 2007, Plaintiff said that two days earlier, she was standing on a chair, painting the kitchen, and when the phone rang, she went to step off the chair and landed on her kneecap. Ms. Teague diagnosed contusion and possible medial collateral strain. Plaintiff said she already had a knee brace and a walker, so Ms. Teague gave her an ACE wrap and ordered an x-ray. (This x-ray occurred, AR 283, but does not appear in the record.)

At the same visit, Ms. Teague also inquired into Plaintiff's mental health treatment. She characterized Plaintiff as "very noncompliant" with her current medications as evidenced by the following: When Topomax was approved four months earlier (in October 2006), Plaintiff never picked it up. She was "supposed" to take Depakote two to three times a day, but said she actually took it "sometimes once a week and sometimes once every two weeks, usually 6 at a time." She had once been put on Zyprexa but said she stopped immediately because she started crying uncontrollably. Plaintiff added that a decade earlier she had been put on Prozac. At the time she was also using marijuana and methamphetamines; she decided to stop the Prozac because she found it made her "very, very violent." Other records show that her parents were given guardianship of her children at this time. AR 61, 62, 95, 414.

At this visit, Ms. Teague stopped the Topamax and Depakote and switched Plaintiff to Seroquel. She scheduled her for a physical ten days later. However, records show that the physical did not occur for two more months. AR 412-14.

10

Two months later (June 15, 2007), there is a record of a second isolated therapy session with Dr. Rourke at Sonora Mental Health. AR 410. It is mostly illegible but does state "probable PTSD." *Id.* That same week (June 12, 2007), Plaintiff completed a Disability Report form. AR 280-85. She denied any change in her condition. AR 281. She listed Dr. Reina as her only doctor; she last saw him (referring, apparently, to Ms. Teague) in April 2007 when she hurt her knee and for her bipolar disorder. Plaintiff no longer listed naproxen, hydrocodone, or any other pain medicine; she only listed Synthroid for her thyroid and Seroquel for bipolar disorder. AR 282.

On June 27, 2007, Plaintiff had a full physical with Ms. Teague. AR 412-13. She did not mention knee pain but focused on psychological complaints. Plaintiff said she was "very irritable, lousy energy, no concentration, no crying. She doesn't feel particularly depressed, just fatigued." Although she felt like yelling and screaming, since starting on Seroquel she had not acted out as much. Ms. Teague continued her Seroquel and added Wellbutrin.

The record also contains a medication list, apparently from between August 2007 and January 2008. It lists Levothyroxine 50mg for thyroid and Seroquel 200mg for bipolar. It also lists ibuprofen, but specifically for a broken arm. AR 287; *see* AR 90.

Six months after the physical with Ms. Teague (December 21, 2007), there is a third isolated therapy session with Dr. Rourke at Sonora Mental Health. Although partly illegible, it says, "Things had been going well up until this month. Even so still better than  last year. … No overt distress noted in session." AR 409.  Plaintiff reported grief after her late grandmother's birthday in October and over the holidays. She did not get out of bed a lot and found it hard to do things. She said that until now she had never had to take care of herself; "I am 36 but I feel 12. I don't want to be a grown up, I would rather be taken care of and be told what I should do." AR 409. The diagnosis reflects major depressive disorder, recurrent; dependent personality disorder; bipolar disorder; and PTSD. AR 409.

Five weeks later (January 30, 2008), Plaintiff saw Dr. Rourke for therapy a fourth and final time. AR 408. Plaintiff had a "really bad last couple of weeks." She was exhausted, disorganized in thought and behavior, crying all the time, having panic attacks, and "too overwhelmed to even pick up a glass of water." She said, "I want help, but won't accept it when offered."  A medication list

11

from February 2008 lists Levothyroxine for thyroid; ferrous sulfate; Abilify as a mood stabilizer; and ibuprofen "as needed" for pain and swelling in the knee and arm. AR 289.

Plaintiff's first ALJ hearing occurred in February 2008.  AR 89-92.  Although she still had knee pain, she said she was not taking any pain medications for her knee, nor was she being treated by Dr. Whitney because her insurance would not cover it, and "they can't do anything with it right now." AR 88.  She said Ms. Teague had instructed her to do leg strengthening exercises, elevate her leg, and use ice and heat to address swelling; however, she was not seeing Ms. Teague for her knee either. AR 89.

The ALJ found Plaintiff not disabled in July 2008. The Appeals Council remanded the case in March 2009. AR 134. One problem was that the ALJ had failed to consider Plaintiff's mother's lay statement from December 25, 2005. However, the Council also noted that the ALJ had relied upon the May 2006 consultative mental health examination by Dr. Lampe, which stated that "with proper treatment the mental impairments could improve significantly within 6 months." The Appeals Council expressed concern that this opinion was not consistent with subsequent medical evidence which reflected "ongoing problems and exacerbations with mental symptoms," specifically the above-mentioned records from February 2007 through January 2008 (Ms. Teague and Dr. Rourke). Although the ALJ had considered these when he issued his first decision (they were submitted to him after the hearing), the Appeals Council felt that they indicated that more records and a new consultative examination were needed. Furthermore, it stated that the ALJ should, if necessary, obtain evidence from a medical expert qualified in psychiatry "to clarify the nature and severity of the claimant's mental impairments." AR 135.

After the Appeals Council remand, Plaintiff provided new medical records. On May 22, 2008—four months after her last therapy with Dr. Rourke in January 2008—Plaintiff initiated care at the Forest Road Health and Wellness Center, the rural clinic of the Sonora Regional Medical Center. AR 448-49. She was referred for abnormal periods and anemia. Under her history, she reported a prior knee surgery and muscle cramps "at night," but otherwise denied other orthopedic symptoms, including muscle weakness, pain in joints, swollen joints, or stiffness. She was treated for anemia and menstrual problems. *Id*.

On September 27, 2009—nineteen months after her last medical appointment—Plaintiff saw consultative psychiatrist Manolito Castillo, M.D. AR 426-29. She acknowledged she was not receiving mental health care at the time. Under chief complaints, he listed bipolar disorder, PTSD, panic attacks, anxiety, and "two knee surgeries." Dr. Castillo opined that Plaintiff had no limitations in her ability to socially interact with others, understand instructions, sustain an ordinary routine without sustained supervision, and complete simple tasks. She had a slight limitation in concentration and moderate limitations in her ability to complete detailed or complex tasks. "Though the claimant did well on assessment, I believe that she still has mental limitations as her mental illness remains uncorrected. It is unfortunate that she is unable to tolerate her medications, as both bipolar disorder and panic disorder could be corrected by psychiatric medications." AR 428.

The next month (October 28, 2009), consultative orthopedist Theodore Georgis, Jr., M.D., examined Plaintiff. AR 435-44. Plaintiff told Dr. Georgis that she fell down the week before, twisting her ankle. Dr. Georgis noted that her ankle was still swollen and diagnosed a mild sprain. He also noted tenderness and swelling with restriction of motion in the right knee. He opined that the ankle sprain would heal quickly but that the right knee condition would continue to impose limitations. Plaintiff could lift or carry up to 10 pounds frequently and 20 pounds occasionally. She could sit, stand, and walk for two hours at a time. She could sit all 8 hours in an 8-hour workday, and could stand or walk 6 hours in an 8-hour workday.  Aside from a few postural limitations, she was largely functionally unlimited. She could perform activities like shopping, travel without a companion for assistance, ambulate without a wheelchair or walker, walk a block at a reasonable pace, use standard public transportation, climb a few steps at a reasonable pace, prepare a simple meal and feed herself, care for her personal hygiene, and sort, handle, and use paper and files.

Plaintiff returned to the Forest Road Health and Wellness Center on March 5, 2010, nearly two years after her previous medical encounter in the record (May 22, 2008, also at Forest Road). On the intake form, Plaintiff said the reason for her visit was that "[I] haven't been on my thyroid meds since 2008 or my iron since 2008." AR 447. On the history, she again complained of muscle cramps, as well as swollen joints, but denied muscle weakness, pain in joints, or stiffness; she indicated knee problems in "2005/2006." AR 446-47. Meeting with nurse practitioner Julia Gustafson, she said she

needed refills of her thyroid medication. AR 460. Ms. Gustafson restarted her on that. Ms. Gustafson also noted that Plaintiff had not taken medication for her bipolar disorder for the past year. She also offered to restart Plaintiff at her previous dose of Trazodone. Plaintiff declined, saying she would wait until she had a counseling appointment with a psychiatrist, Dr. Galen Savage. She scheduled this for the following week. There is no sign that it occurred.

Six weeks later (April 17, 2010—two weeks before the ALJ hearing), Plaintiff was taken to an emergency room by friends; Plaintiff told the ALJ that she believed they took her because "I felt like everything was closing in and I couldn't get myself to calm down and I have a tendency when I get like that to work through it by hurting myself." AR 56-57. At the emergency room, she was evaluated by Robert Lyons, M.D. Plaintiff's complaint was "out of control anxiety." She reported staying in her room a lot and feeling "jumpy and anxious." This had been escalating in the past weeks, possibly due to the approach of the anniversary of her grandmother's death the month before. Plaintiff acknowledged that she had "quit all her medications" a year and a half earlier. Plaintiff also said that six weeks earlier, she was arrested for taking a friend's Valium without a prescription. She also acknowledged smoking marijuana (and her toxicology was positive for marijuana). She reported that she had been cutting herself; an examination of her arms showed "very old" linear cuts. However, she told the doctor that she did not have suicidal ideations, had never attempted suicide in the past, and felt comfortable with outpatient counseling. Dr. Lyons found her stable, gave her 1mg Ativan for anxiety, and after a brief period of observation discharged her.

Later that day, Plaintiff's mother took her to the Forest Road Health and Wellness Center, where Plaintiff saw Ms. Gustafson. AR 56, 461. Ms. Gustafson prescribed Ativan 0.5 mg for anxiety, to be taken "if needed." AR 55, 293. She also set up an appointment for Plaintiff to see a therapist on May 4. AR 55-56. A medication list from this time includes the Ativan, as well as Levoxyl for thyroid and ferrous sulfate 325 mg for anemia, but no medications for pain. AR 293.

Two weeks later, on May 5, 2010, Plaintiff testified at her second hearing. She was 38, stood 5'4" and weighed 190 pounds, down from her high of 225 pounds in December 2005. Plaintiff testified that stress and anxiety often kept her from leaving her house or even her room within the house. She described several episodes of anxiety and panic attacks, including her recent visit to the

emergency room. Her attorney noticed "something" on her arm, and Plaintiff explained that she had cut herself that morning because she was scared of coming to the hearing. AR 64. Housework was too stressful, although she could cook when motivated to and could attend to her own self-care and hygiene. Her caregiver did most of the day-to-day functions in her home.

Plaintiff acknowledged that, until the ER visit, she had not sought mental health treatment for a long time (the record indicates more than two years). She explained that the appointments were too stressful and the medicines kept changing and did not seem to be helping. AR 66-67. Her attorney asked her if, after being taken to the E.R., she now felt differently about going to her appointments. Plaintiff said yes: the E.R. visit was "pretty much my mom's breaking point. I either go to my doctor's appointments or I don't get to talk to my son." Since that time, she said she had missed one out of four appointments. AR 67.

The ALJ asked if Plaintiff was still being treated for her right knee. Plaintiff said she was not. "It still swells up and it still hurts and stuff, but I've been pretty much trying to focus on … one thing at a time." AR 57. In the past she used a cane for ambulation, but had now stopped using it; "I've been keeping a little bit more balance of myself now." She experienced swelling from a couple of times a week to a couple of times a month; then she would need to put her leg up and rotate ice and heat for a half hour. AR 57, 60, 63. She could walk about 100 yards, stand 30 to 45 minutes, and sit for about two hours before needing to put her leg up. She described no other knee-related limitations.

## B. Testimony of Medical Expert

At the hearing, the ALJ heard the testimony of Irwin Shapiro, M.D., a medical expert in psychiatry. AR 68-72. Dr. Shapiro testified that Plaintiff had an affective disorder (Listing 12.04) and a personality disorder (Listing 12.08) and that these two impairments would not meet or equal a listing. However, he added that Plaintiff also had physical impairments of hypothyroidism and orthopedic pain, and that these "complicated" the paragraph B criteria such that Plaintiff would equal a listing, in that she would have to miss one day of work a week. Dr. Shapiro clarified that he had seen many patients suffer from a "pain depression syndrome," whereby pain and depression can amplify each other, leading the individual to take days off work and sleep more.

///

15

### C.    Testimony of Vocational Expert

George Meyers, an impartial vocational expert, stated that Plaintiff had a work history of hotel desk clerk (light, 4) and customer service representative (sedentary, 5).[4] He then assumed a person of Plaintiff's age, education, and work history, and testified to the work such a person could do given various assumptions about her limitations. *Cf.* 20 C.F.R. §404.1560(c)(1). AR 73-76.

The first hypothetical represented the limitations described by the state agency examining consultants, Drs. Georgis and Castillo. Plaintiff could lift 20 pounds occasionally, 10 frequently; sit 8 hours, stand 6 hours, and walk 6 hours during a workday; occasionally climb stairs, but never ladders, ropes, or scaffolds; could not crouch, kneel, or crawl; could only do work "involving simple, repetitive instructions [Dr. Castillo used the word "tasks"] and having restricted contact with the public." Mr. Meyers said that this person could not perform Plaintiff's past work, but could do representative occupations such as Auto Packer (light, 2—15,000 jobs in California), Assembly of Small Products (light, 2—30,000 jobs) and Office Help (light, 2—31,000 jobs). AR 74-75.

The second hypothetical was proposed by Plaintiff's attorney. Due to anxiety, the person needed three or four unscheduled rest breaks daily, 15 to 30 minutes each, and needed to elevate one leg every two hours for 30 minutes. Mr. Meyers stated these limitations would preclude all work.

## II.    Disability Standard

In order to qualify for benefits, a claimant must establish that she is unable to engage in substantial gainful activity due to a medically determinable physical or mental impairment which has lasted or can be expected to last for a continuous period of not less than twelve months.  42 U.S.C. § 1382c (a)(3)(A).  A claimant must show that she has a physical or mental impairment of such severity that she is not only unable to do her previous work, but cannot, considering her age, education, and work experience, engage in any other kind of substantial gainful work which exists in

---

[4] In the parenthetical, the strength rating captures how much exertion the job requires and whether this is occasional (up to a third of a day), frequent (two thirds), or constant. The Specific Vocational Preparation number ranks, from one to nine, how long it takes to learn the job. Dictionary of Occupational Titles (4th ed.1991) Appendix C.

the national economy. *Quang Van Han v. Bowen*, 882 F.2d 1453, 1456 (9th Cir. 1989). The burden is on the claimant to establish disability. *Terry v. Sullivan*, 903 F.2d 1273, 1275 (9th Cir. 1990).

To make the disability determination more uniform and efficient, ALJs follow a five-step "sequential evaluation process," stopping once they reach a dispositive finding. 20 C.F.R. §§ 404.1520, 1594(b)(5). The sequential process begins with a "*de minimis* screening device to dispose of groundless claims." *Smolen v. Chater*, 80 F.3d 1273, 1290 (9th Cir.1996). At steps one and two, the ALJ confirms that the claimant is not meaningfully employed and in fact has severe impairments. Once a claimant passes this screening, the remaining steps examine whether she is disabled. A claimant may prove this in two ways. One way—considered at step three—is to have a condition that is disabling by definition. *See* 20 C.F.R. Pt. 4, Subpt. P, App. 1 (the "listings"). Failing this, a person must present evidence of a residual functional capacity ("RFC"), which captures the most an individual can do despite any limitations. The ALJ determines a claimant's RFC, then at steps four and five applies this to the world of work. If the RFC forecloses past work, and if the Commissioner cannot identify a significant number of other available jobs, then a finding of disability is established.

## III.   **The ALJ's Decision**

Using the Social Security Administration's five-step sequential evaluation process outlined above, the ALJ determined that Plaintiff did not meet the disability standard. AR 34. More particularly, the ALJ found that Plaintiff had not engaged in substantial gainful activity since October 4, 2004. AR 23. Further, the ALJ identified right patellar dislocation, obesity, post-traumatic stress disorder, bipolar disorder, and anxiety disorder as severe impairments. AR 23. Nonetheless, the ALJ determined Plaintiff's impairment did not meet or exceed any of the listed impairments. AR 23-33.

Based on his review of the entire record, the ALJ determined that Plaintiff has the RFC to perform a reduced range of light work. AR 25. Specifically, the ALJ found that Plaintiff could lift

20 pounds occasionally, 10 pounds frequently; sit 8 hours, stand 6, and walk 6 in a workday; occasionally climb stairs; but never climb ladders, ropes, or scaffolds; and never crouch, kneel, or crawl.  In addition, she was limited to "work involving simple repetitive tasks with no public contact." AR 25.   Next, the ALJ determined that Plaintiff could not perform her past work.   AR 32.  However, she could do a significant number of other jobs including an auto packer (light, 2—15,000 jobs), assembly of small parts,  (light, 2—30,000 jobs) and office help (light, 2—31,000 jobs).

On appeal, Plaintiff argues that at step five, the ALJ improperly found that Plaintiff could do the jobs described by vocational expert: these required "Level Two reasoning" (defined in the Dictionary of Occupational Titles to include the ability to follow "detailed but uninvolved … instructions").  She contends that this was inconsistent with one of the limitations in the hypothetical posed by the ALJ (only following "simple instructions").  She also argues that the ALJ also erred by relying on the vocational expert's response to this hypothetical question because the ALJ's RFC finding ultimately limited Plaintiff to "simple repetitive tasks," not "simple instructions." Finally, Plaintiff argues the ALJ improperly rejected Dr. Shapiro's testimony that at step three Plaintiff 's conditions equaled a mental listing due to her psychological and physical impairments.

## IV.   **Scope of Review**

Congress has provided a limited scope of judicial review of a decision to deny benefits under the Act. This Court may review only whether the decision applied the proper legal standards and made findings supported by substantial evidence. *Bray v. Comm'r*, 554 F.3d 1219, 1222 (9th Cir. 2009). Substantial evidence is more than a scintilla but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Id*. Where the record as a whole can support either a grant or denial, the Court may not substitute its judgment. *Id*.

## V.   **Discussion**

### A.   **The Vocational Expert's Testimony Was Consistent with the DOT**

At the hearing, the ALJ asked the vocational expert whether a person could work given Plaintiff's vocational profile and the limitations described by the state agency examining physicians,

including the ability only to follow "simple instructions." The vocational expert described several

jobs. He said his testimony was consistent with the Dictionary of Occupational Titles; the ALJ

agreed. AR 34, 75; *see Massachi v. Astrue,* 486 F.3d 1149, 1153 (9th Cir.2007) (citing SSR 00–4p).

Plaintiff disagrees. She argues that a person limited to following only "simple instructions"

could not perform these jobs, because they have a "reasoning level" of two. Reasoning levels one

and two are defined as follows:

> [Level One Reasoning]: **Apply commonsense understanding to carry out simple one- or
> two-step instructions.** Deal with standardized situations with occasional or no variables in
> or from these situations encountered on the job.

> [Level Two Reasoning]: **Apply commonsense understanding to carry out detailed but
> uninvolved written or oral instructions**. Deal with problems involving a few concrete
> variables in or from standardized situations.

*Dictionary of Occupational Titles*, Appendix C (4th ed. 1991) (emphasis added); *see Meissl v.

Barnhart*, 403 F. Supp. 2d 981, 983 (C.D. Cal. 2005). Plaintiff argues that a person limited to

"simple" instructions would not be capable of following "detailed but uninvolved" instructions in

jobs of reasoning level two.

Although there are no published Ninth Circuit cases explaining how to apply the DOT's

Reasoning Level definitions, district courts in this circuit have applied these definitions to a variety

of limitations. For example, according to one survey, the Eastern District of California "repeatedly

has refused to discern any material error in administrative decisions in which ALJs have found that

claimants who were limited to 'one-to-two step instruction' jobs could perform jobs requiring Level

2 reasoning." *Munoz v. Astrue*, ED CV 11-2042-E, 2012 WL 2974669 (C.D. Cal. July 20, 2012)

(surveying cases). By contrast, Plaintiff asks the Court to defer to several unpublished orders from

the District of Oregon which remanded for further testimony under a variety of limitations. *See

James v. Astrue,* 3:07-cv-06350-HA, 2008 U.S. Dist. LEXIS 118685, *8 (D.Or. Nov. 17, 2008)

(claimant can "understand, remember and carry out simple instructions under normal supervision on

a sustained basis, but not with detailed or complex instructions or tasks"); *Burnsides v. Astrue*, 3:09-

cv-06160-BR, 2010 WL 2730966 (D. Or. July 9, 2010) (claimant limited to "simple, routine

instructions and tasks"); *Pope v. Astrue*, 3:10-cv-06019-PK, 2011 WL 3584802 (D. Or. May 20,

2011) (claimant can "understand and remember simple instructions and carry out simple routine

19

tasks"); *Millner v. Commissioner*, 6:11-cv-06162-HO, Order, March 23, 2012 (claimant limited to "work requiring understanding, remembering and carrying out, short and simple instructions") (*see* Doc. 17, Ex. A).

Although *Munoz* is not a published order, it lays out a sensible approach to determining the reasoning level that corresponds to a stated RFC. By comparison, the unpublished District of Oregon orders cited by Plaintiff are not carefully reasoned. As *Munoz* explained—relying in part on a case from this district, *Gonzales v. Astrue,* 1:10-cv-1330-SKO, 2012 WL 14002 (E.D.Cal. Jan.4, 2012)—

> [T]he decisive question concerns the intendment of the ALJ's residual functional capacity finding (as incorporated into the hypothetical posed to the vocational expert). Specifically, the decisive question is: Did *this* ALJ find that *this* severe mental impairment limited *this* Plaintiff to jobs requiring only Level 1 reasoning?

*Munoz* at *1. To determine what reasoning level the ALJ found a claimant capable of, the court in *Munoz* considered three (nonexclusive) factors. First, did the ALJ's RFC finding use language that closely paralleled the language of a DOT definition? In *Munoz*, the ALJ found the claimant capable of working in "one-to-two step instruction jobs" and found that this closely paralleled the DOT's definition of level one (having the ability "to carry out simple one-or-two-step instructions"). Second, what language was chosen by the expert sources that the ALJ relied upon in reaching the RFC finding? In *Munoz*, these doctors also used language nearly identical to the language of level one. Third, does the record suggest that the claimant was limited to level one? In *Munoz*, the record contained some evidence that the claimant's mental impairments had reduced his functioning below level two reasoning.

The opposite conclusion is proper here. First, the ALJ's chosen language did not "mirror" the "simple one- or two-step instructions" language in the level one reasoning definition. Unlike in *Munoz* ("one-to-two step instructions") and *Gonzales* ("simple, one- or two-step instructions"), here the limitation is to "simple instructions." Second, the same is true of the two psychiatric consultative examiners on which the ALJ relied. In 2009, Dr. Castillo opined that Plaintiff had no limitations in her ability to complete "simple tasks" or "understand instructions," and moderate limitations in her ability to complete "detailed tasks" and "complex tasks." He thus adopted the dichotomy between "short and simple instructions" and "detailed" or "complex" instructions which appears in the Social

Security regulations. *Meissl*, 403 F. Supp. 2d at 984; *see* 20 C.F.R. § 416.969a(c)(1)(iii). But as *Meissl* persuasively argues, this dichotomy was not intended to mirror the language in the reasoning levels. "Simple" from the regulations is distinct from "simple" from the DOT, and "detailed" from the regulations is distinct from "detailed but uninvolved" in the DOT. *Meissl* at 983-84. Likewise, in 2006, Dr. Lampe opined that Plaintiff "could understand, remember, and carry out simple instructions. She might have difficulty with complex instructions." AR 342.

Plaintiff views Dr. Lampe's word choice as significant. Dr. Lampe used the term "instructions" instead of tasks, as did the ALJ when formulating his hypothetical at the hearing; "instructions" is also the word that appears in the text of the reasoning levels. However, the evidence suggests that the ALJ simply did not see a distinction between the words and used them interchangeably. He relied on Dr. Lampe who said "instructions," but he also relied on Dr. Castillo who said "tasks." He used "instructions" in the hypothetical, but he used "tasks" in his RFC finding. Even district courts consistently use the terms interchangeably. *See Whitaker v. Astrue*, 1:09CV0975 DLB, 2010 WL 1444659 (E.D. Cal. Apr. 12, 2010) ("the cases are not distinguishable on the basis of the instruction/task distinction"); *see also Xiong v. Comm'r of Soc. Sec.*, 1:09-CV-00398-SMS, 2010 WL 2902508 (E.D. Cal. July 22, 2010) (stating that Ninth Circuit district courts have "consistently held that a limitation requiring simple or routine instructions encompasses the reasoning levels of one and two," but surveying cases where the limitations touch upon "instructions," "tasks," and "work"); *Meissl*, F.Supp.2d at 984 (using "instructions" and "tasks" interchangeably); *Munoz* (finding that courts in the Eastern District of California "repeatedly has refused to discern any material error in administrative decisions in which ALJs have found that claimants who were limited to 'one-to-two step instruction' jobs could perform jobs requiring Level 2 reasoning," but citing cases that rely on *Meissl*).

Plaintiff also argues that the dictionary supports the conclusion that "simple instructions" corresponds more closely to level one reasoning than "simple tasks." She explains that instructions are more basic than tasks: "even one task may require following more than one instruction." Pl. Brief at 7. But the dictionary shows that the opposite is also true: an instruction may also entail more than one task. *See* Task, *available at* http://www.ahdictionary.com ("A piece of work assigned or done as

part of one's duties"); Instructions, *available at* http://www.ahdictionary.com ("Detailed directions about how to do something"). The words are interchangeable. Furthermore, even if Plaintiff was correct and "simple instructions" was more restrictive than "simple tasks," Plaintiff does not explain why it follows that the term therefore denotes level one reasoning.[5]

The third factor in *Munoz* is whether the evidence supports a finding that Plaintiff could work at reasoning level two. It does. Unlike in *Munoz*, where the ALJ entirely failed to address a lay statement describing the claimant's limitations, here the ALJ considered the lay evidence, the medical record evidence, and the medical opinions, including the opinions of Drs. Castillo and Lampe.   For all these reasons, the Court finds that the ALJ intended to give Plaintiff an RFC including Level Two reasoning. Reliance on the vocational expert's testimony was therefore not in error.

## B.   The ALJ's Step Three Analysis

Plaintiff argues that the ALJ erred at step three because he improperly rejected the testimony of Dr. Shapiro, who testified that when the psychological and medical aspects of Plaintiff conditions were considered, her psychological impairments equaled a listed impairment.   The Commissioner contends the ALJ properly considered all of the medical evidence in determining that Plaintiff's impairments do not equal a listed impairment.

The listings of impairments describe impairments "that are considered severe enough to prevent an adult from doing any gainful activity."   20 C.F.R. § 416.925(a).   Most of these impairments are permanent or expected to result in death.   *Id.*   For all other impairments, the evidence must show that the impairment has lasted or is expected to last for a continuous period of at least 12 months.   *Id.*   If a claimant's impairment meets or equals a listed impairment, he or she will be found disabled at step three without further inquiry.   20 C.F.R. § 416.920(d).

To demonstrate that an  impairment matches a listed impairment, the claimant must show

---

[5] Separately, Plaintiff argues that the ALJ erred by using the word "tasks" in his RFC finding after having used the term "limitations" in the hypothetical posed to the vocational expert. Plaintiff again relies on the proposition that a limitation to "simple instructions" is more restrictive than a limitation to "simple tasks." Although the Court rejects this proposition, it is worth noting that if Plaintiff was correct, then the hypothetical was more stringent than the RFC, and any error was harmless.

that the impairment meets *all* of the medical criteria in a Listing. *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990). "An impairment that manifests only some of those criteria, no matter how severely, does not qualify." *Id.* To "equal" a listed impairment, a claimant must establish symptoms, signs and laboratory findings "at least equal in severity and duration" to the characteristics of a relevant listed impairment." *Tackett v. Apfel*, 180 F.3d 1094, 1099 (9th Cir. 1999); 20 C.F.R. §§ 404.1526(a), 416.926(a). For claimants with mental impairments, these must (among other things) meet or equal any two of the following "paragraph B" (functional) criteria: Marked restriction of activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence, or pace; or repeated episodes of decompensation, each of extended duration.

Under the law of this circuit, an ALJ is not required to discuss the combined effects of a claimant's impairments or compare them to any listing in an equivalency determination, unless the claimant presents evidence in an effort to establish equivalence. *Burch v. Barnhart*, 400 F.3d 676, 683 (9th Cir. 2005); *See Lewis v. Apfel*, 236 F.3d 503, 514 (9th Cir. 2001) (in distinguishing *Marcia v. Sullivan*, 900 F.2d 172 (9th Cir. 1990), the court determined that the ALJ's failure to consider equivalence was not reversible error because the claimant did not offer any theory, plausible or otherwise, as to how his impairments combined to equal a listing impairment).

At the hearing, medical expert Dr. Shapiro testified that Plaintiff did not "equal" a listing when her mental impairments were viewed in isolation. AR 69-70. The ALJ agreed and concluded that Plaintiff had only mild restrictions in activities of daily living (she could attend to personal self-care, do some household chores, and move about with little restriction); showed no limitations in social functioning (despite her history of angry outbursts and reports of self-isolating behavior, the medical history showed her symptoms were well-controlled with medication); had moderate difficulties in concentration, persistence, or pace (adopting the findings of the state agency examining and consulting doctors); and exhibited insufficient episodes of decompensation. AR 23-

24.

However, Dr. Shapiro also stated a second opinion: he testified that Plaintiff equaled a listing (either 12.04 or 12.08) when her hypothyroidism and orthopedic pain were viewed as part of a "pain depression syndrome." AR 70. The ALJ disregarded this opinion, explaining that "[Dr. Shapiro's] consideration of medical problems in the initial response was inconsistent with listing 12.04 and 12.08, neither of which calls for assessment of medical problems as part of the analysis." AR 28. Plaintiff argues that by failing to consider whether her physical and mental impairments together equaled a listing, the ALJ ignored the holding in *Lester v. Chater*, 81 F.3d 821 (9th Cir. 1995).[6]

As a preliminary matter, the Court finds that Plaintiff did not meet her burden in establishing that her severe impairments were equivalent to a listed impairment, and further analysis was not required. *See, Burch v. Barnhart*, 400 F. 3d at 683: *Lewis v. Apfel*, 236 F. 3d 514. Although Dr. Shapiro testified at the hearing that Plaintiff's conditions were equivalent to a listing, he offered no medical basis for his explanation. AR 68-73. For example, he did not point to any documented evidence including signs, symptoms, or other tests he completed in support of his conclusions. 20 C.F.R. pt. 404, Supt. P. App. 1 Similarly, other than arguing the ALJ should adopt Dr. Shapiro's opinion, Plaintiff has not argued with specificity how her conditions in isolation or in combination meet any of the listings. Here, the ALJ rejected Dr. Shapiro's opinion after thoroughly examining both Plaintiff's physical and mental  conditions and found Plaintiff did not meet her burden at step three. AR 21, 24, 28, 31. Even if this Court were to find that the ALJ's analysis was faulty because no specific reference to the *Lester* criteria was made, any error would be harmless for the reasons set forth below.

---

[6] Plaintiff also argues that *Lester* requires remand for payment of benefits. However, even if remand were appropriate, *Lester* applied the "credit-as-true" doctrine only to improper rejection of a treating or examining physician. *Lester* at 834; *see Agnew-Currie v. Astrue*, 875 F. Supp. 2d 967 (D. Ariz. 2012) (synthesizing Ninth Circuit "credit-as-true" doctrine, and arguing it does not apply at step three); *but see Schneider v. Comm'r of Soc. Sec. Admin.*, 223 F.3d 968, 976 (9th Cir. 2000) (crediting lay evidence and finding it sufficient to meet or equal listing 12.04). Furthermore, *Lester* specifically stated that in cases where failure to consider the combined effects of physical and mental impairments was the "only error," remand for further proceedings would be "required." *Lester* at 831.

In *Lester*, the claimant suffered from physical and psychological conditions, including back pain and depression. At the hearing, the medical expert testified that his mental impairments alone would not equal a listing. However, he also testified that the claimant had "chronic pain syndrome," and if his physical impairments were also taken into consideration and if his pain testimony were credited, he would equal a listing. The ALJ rejected the second half of this testimony, finding that the expert had wrongly attributed some symptoms to mental impairments which were properly attributable to physical impairments. On appeal, the Ninth Circuit rejected the ALJ's approach. Interpreting the phrase "combination of impairments" in the regulations, 20 C.F.R. § 404.1526(a), the court explained that "[f]or purposes of determining whether this listing *is* equaled, it is irrelevant whether Lester's symptoms resulted solely from his mental impairments or from a combination of his mental and physical impairments. … [T]he Commissioner must consider whether these impairments *taken together* result in limitations equal in severity to those specified by the listings." *Lester* at 829-30. (Emphasis in original).

Although *Lester* requires that physical and mental impairments be considered together, this requirement only applies to individual impairments which meet a certain minimum severity— specifically, those capable of independently contributing to one of the "Paragraph B" limitations. The ALJ did consider each impairment independently, assessed the limitations each would cause, and assigned minimal limitations to Plaintiff's physical impairments which could not have contributed to any Paragraph B limitations.  AR 24, 27-32.  As a result, the definition of harmless error is met here: the "reviewing court … can confidently conclude that no reasonable ALJ … could have reached a different disability determination." *Stout v. Commissioner, Social Sec. Admin*, 454 F.3d 1050, 1056 (9th Cir. 2006).

*Lester* requires considering impairments in combination, but only once certain triggering conditions are met. As the court explained:

> [T]he Commissioner is required to take into account the combined effect of a claimant's physical and mental impairments in determining whether his condition equals [listing 12.04]. … For purposes of determining whether this listing *is* equaled, it is irrelevant whether Lester's

1
2
3
4
5
6
7
8

> symptoms resulted solely from his mental impairments or from a combination of his mental and physical impairments. There is no dispute that Lester had significant mental *and* physical impairments, each of which resulted in some restrictions on his ability to function in the areas specified by paragraph B. Indeed, the medical experts appear to agree that the part of his limitations arising from his physical impairment—acute pain—cannot easily be segregated from the part arising from his mental impairments. Lester's condition, which the medical advisor referred to as "chronic pain syndrome," has both a physical and psychological component. … Pain merges into and becomes a part of the mental and psychological responses that produce the functional impairments. The components are not neatly separable. Given that the consequences of Lester's physical and mental impairments are so inextricably linked, the Commissioner must consider whether these impairments *taken together* result in limitations equal in severity to those specified by the listings. … [FN 6:] Because in this case the effects of the physical and mental limitations are inseparable from a medical standpoint, and are thus inextricably linked, we need not consider whether or under what circumstances such linkage is necessary in order to find that a combination of two different impairments equals a listing.

9  *Lester* at 828-30. In short, *Lester* suggests that this requirement only applies to impairments that

10  meet a certain minimum severity threshold. In *Lester*, the court satisfied itself that the claimant had

11  "significant mental *and* physical impairments" because each "resulted in some restrictions on [the

12  claimant's] ability to function in the areas specified by paragraph B." (*Lester* also noted that the

13  claimant's impairments could not be "easily be segregated," but declined to consider "whether or

14  under what circumstances such linkage is necessary.") In *Lester*, there was "no dispute" that this

15  threshold condition had been met because the ALJ made this finding himself, relying in part on the

16  opinions of two physicians—an examining psychologist and a treating physician who specialized in

17  chronic pain. Both doctors further opined that the claimant's physical and mental impairments

18  together would leave him markedly impaired in many ways.

19      Here, this threshold condition cannot be satisfied. Unlike in *Lester*, no treating or examining

20  doctor identified physical limitations of this severity or even suggested that Plaintiff's physical

21  limitations could impact her mental limitations. Nor can the record support this finding. The physical

22  impairments that Plaintiff alleged were hypothyroid syndrome, which the ALJ found was well-

23  controlled with medications; obesity, which the ALJ found did not increase her other symptoms; and

24  knee pain.  AR 31-32.  Thus, only the knee impairment could implicate the Paragraph B limitations.

25  The ALJ did accept that this caused limitations. But these limitations would not rise to the level of

26  interfering with daily activities, social functioning, or concentration.

27      Plaintiff claims her knee pain started when she was fourteen years old. AR 440.  Her first

28  complaint in the record was an emergency room visit in October 2004, four days after she injured

herself moving furniture.  AR 325.  She was offered Vicodin but declined it. *Id*. Two months later she reported her injury to a nurse. A year later she had knee surgery. AR 330-335.

She and her mother wrote function reports and a pain report less than a month after this procedure.  AR 230-240.  These reports describe serious physical limitations. Yet they obviously reflect Plaintiff's recovery from the surgery. No ALJ who recognized this connection could have found otherwise. For example, Plaintiff's mother claimed that she could not concentrate due to pain medicine, but Plaintiff only took Vicodin for a few weeks after the surgery. She could not drive due to the brace on her leg, but Dr. Whitney had recently instructed Plaintiff to always wear the brace. Plaintiff herself wrote that most of her pain was attributable to the surgery, not to her injury.

Plaintiff had a difficult recovery period for several months, however, the ALJ considered and accounted for this period of limitation. In rejecting a June 2008 physical RFC finding by a state agency consultant which contained more severe limitations than those he adopted, the ALJ noted that the medical evidence had shown improvement after the surgical procedures. AR 32.   Plaintiff's last report to her physical therapist was that she could walk up and down four flights of stairs with soreness and that her pain was less than a four out of ten. She then did not attend her one remaining appointment and was discharged.  AR 350-351.

For the next year, the record shows neither objective measurements nor subjective complaints of knee issues. Plaintiff did not mention her knee in visits with Ms. LaTorre; she did not mention it in a disability report and a function report prepared for her disability application. When Plaintiff next complained of knee pain, she did not attribute it to her original injury. Instead, in April 2007, she complained of a "re-injury" from stepping off a chair and landing on her kneecap. AR 414. A nurse practitioner diagnosed contusion and possible medial collateral strain and gave her an ACE wrap and a date for a full physical ten days later. AR 414.  Plaintiff did not attend the physical. When she did have a physical in June 2007, she was not taking any pain medicine. She mentioned mental issues but did not mention her knee. AR 412-413.  In February 2008, she told the ALJ at her first hearing that she was not taking any pain medicine for her knee. AR 89.  She listed the reasons she was seeing a nurse practitioner but did not mention any knee issues. In May 2008, she initiated

care at a new clinic. In the history, she mentioned muscle cramps "at night" but denied other orthopedic symptoms. AR 448-449.

In fact, the only medical evidence at all that Plaintiff "re-injured" her knee consists of her consultative examination with Dr. Georgis in October 2009. At this appointment, Plaintiff said she had sprained her ankle the week before. AR 440-441.  She complained of intermittent pain in the right knee approximately two days a week and swelling in the knee daily. Describing impact on activities of daily living, Dr. Georgis wrote that she used a shower chair and needed a walker to do housework. (Plaintiff added that she spent most days at home in bed, but did not attribute this limitation to her knee. Throughout the record she attributed this to anxiety and panic attacks).  Dr. Georgis said she could walk, sit, and stand for 2 hours at a time, could walk and stand for 6 hours in a workday, and could sit for an entire workday. He did not credit Plaintiff's alleged limitation of having to elevate her leg after prolonged sitting. Plaintiff could shop, travel without a companion, and use public transportation without limitation. AR 433-445.

Five months later, in March 2010, Plaintiff returned to the Forest Road clinic. Her intake form mentioned muscle cramps and swollen joints but denied other orthopedic limitations and characterized her knee problems as occurring in "2005/2006."  AR 446-447.  At the ALJ hearing, in May 2010, she described swelling in her knee, from twice a month to twice a week, which she would treat with ice and heat. AR 57.  She acknowledged that she no longer needed a crutch or cane to walk, and acknowledged improvement. AR 60.  At this point, aside from her consultative evaluation, she had not seen a doctor regarding her knee, or even complained of knee pain, since roughly three years earlier when she told Ms. Teague that she had fallen off a chair and was given an ACE wrap.

On these facts, the ALJ could not have found that Plaintiff's knee impairment "resulted in some restrictions on [her] ability to function in the areas specified by paragraph B." *Lester* at 829. In terms of impact on activities of daily living, Dr. Georgis listed these as using a shower chair and using a walker when doing housework. In terms of her ability to maintain social functioning, Plaintiff did allege such limitations, but attributed these to her mental impairments. The ALJ found that she had no social functioning limitations at all. Plaintiff did not allege any limitation attributable to her social functioning. Finally, in terms of ability to maintain concentration, persistence, or pace:

the only evidence of any impact is the December 2005 statement by Plaintiff's mother, stating that Plaintiff had trouble enjoying activities such as watching TV or reading because of "pain medications messing with concentration." As explained above, Plaintiff was taking Vicodin following surgery three weeks earlier. This was an isolated incident and cannot be extrapolated beyond the time period of Plaintiff's recovery from her surgery.

Thus, although *Lester* requires an ALJ to consider all impairments in combination, the ALJ could not have found that Plaintiff's physical impairments were sufficiently severe to trigger this requirement. Thus, any failure to make this explicit finding was harmless error. *Molina v. Astrue*, 674 F. 3d 1104 (9th Cir. 2012) citing *Carmickle v. Comm'r Soc. Sec. Admin.*, 533 F. 3d 1155, 1162-1163 (9th Cir. 2008). (An ALJ's error is harmless where it is "inconsequential to the ultimate disability determination.").

## VI.   Conclusion

Substantial credible evidence supports the ALJ's determination that Plaintiff was not disabled, and the ALJ did not commit any reversible legal error. Accordingly, the undersigned recommends that the District Court affirm the Commissioner's determination.

These Findings and Recommendations will be submitted to the Honorable Lawrence J. O'Neill, United States District Judge, pursuant to 28 U.S.C. § 636(b)(1). On or before **thirty (30) days** from the entry of this decision, any party may file written objections with the Court. The document should be captioned "Objections to Magistrate Judge's Findings and Recommendations." Plaintiff is advised that, by failing to file objections within the specified time, she may waive the right to appeal the District Court's order. *Martinez v. Ylst*, 951 F.2d 1153 (9th Cir. 1991).

IT IS SO ORDERED.

Dated:   __July 9, 2013__                    _____/s/ Gary S. Austin____
                                          UNITED STATES MAGISTRATE JUDGE

29